BERTHA TOBOLT *et al.*, Plaintiffs-Appellants, *v.* ALLSTATE INSURANCE CO., Defendant-Appellee.

First District (1st Division)   No. 78-2102

Opinion filed August 6, 1979.

John Panici, of Chicago, for appellants.

Conklin, Leahy and Eisenberg, Ltd., of Chicago (Stephen P. Eisenberg, Franklin A. Nachman, and Brian C. Powers, of counsel), for appellee.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiffs, Bertha Tobolt and Vance Tobolt, to whom defendant, Allstate Insurance Co. (Allstate), had issued a homeowners' policy, filed suit against Allstate. Count I was for the failure by defendant to pay the proper amounts for a fire loss suffered by plaintiffs; count II, for the intentional infliction of severe emotional distress; and count III, for failure to act in good faith in dealing with plaintiffs. Defendant moved to strike

and dismiss counts II and III on the ground that both counts failed to allege facts sufficient to state causes of action. The trial court dismissed both counts with prejudice and denied plaintiffs' motion to vacate the dismissal order. Plaintiffs appeal. Count I is not before us.

Plaintiffs' home was insured up to $40,000 by Allstate under a Homeowners' Policy. Coverage was also provided for the loss of personal property up to $20,000 and for additional living expenses up to $8,000. On March 17, 1976, while the policy was in effect, plaintiffs' home was extensively damaged by fire, personal property was destroyed and plaintiffs were forced to obtain temporary living quarters. Allstate refused to pay the amounts plaintiffs claimed were due under the policy and plaintiffs filed suit.

Count II for damages for intentional infliction of severe emotional distress alleged:

Allstate was obligated under its policy to pay more than $20,000 for repairs to plaintiffs' home, more than $11,000 for clothing and personal property lost, and more than $4,000 for additional living expenses, a total of more than $35,000, but that Allstate had paid less than $20,000 and refused to make any further payments.

At the time of the loss, plaintiffs owned no assets or property of any appreciable value, with the exception of their home and personal belongings consumed by the fire. Their home was encumbered by a mortgage with a final "balloon note" payment of over $5,000 due on July 5, 1977. To meet this note, plaintiffs had to maintain a good credit rating and to maintain their home in a satisfactory condition to seek refinancing. As a result of the fire loss, plaintiffs were indigent and in great financial distress and were unable to pay off the note because of bills incurred due to the fire; they were without funds to pay bills for living expenses, particularly for temporary living quarters; and they were unable to purchase needed items of clothing and personal property and to pay for additional repairs to their home.

As a direct result of the refusal of Allstate to honor the repeated demands of plaintiffs and in spite of their attempt to have the Department of Insurance intervene in their behalf, plaintiffs continued to become more heavily in debt and in deeper financial distress. The motels where they had made their temporary residence were dunning them for payment and threatening suit. Plaintiffs were compelled to borrow money, accept gifts and depend on the help of relatives in order to privide the necessities of life. Plaintiffs had to seek the assistance of the American Red Cross to pay one of the motels. Plaintiffs' credit has been severely damaged because of late payment and nonpayment of bills. Plaintiff Bertha Tobolt has become extremely nervous, has had to seek medical attention for her nerves, is required to take pills and has lost time

from her employment. Plaintiff Vance Tobolt has a previously incurred physical disability requiring him to sleep on a certain type of bedding in his home. His temporary lodging in motels was unduly long, greatly inconvenienced him and caused him physical and mental distress. Plaintiffs' home has depreciated in value because of its state of disrepair. Plaintiffs have had to plead with the mortgage holder to forego insistence on the lump sum payment.

Allstate had notice and knew, or had reason to know full well, that its deliberate and unwarranted refusal to honor numerous demands during a time when plaintiffs were in dire need of the insurance proceeds would be and was in reckless disregard of and harmful to the interest of plaintiffs and would impair their ability to provide the necessities of life for themselves and their son. Allstate has persisted in the use of dilatory tactics in the settlement of plaintiffs' claim and has also delayed in even giving its approval to commence repairs for a period in excess of two months. Allstate has repeatedly sought to minimize the payment of a just claim and has not provided sufficient funds to properly repair plaintiffs' home and has otherwise persisted in its refusal to pay the claim in full. Allstate has paid the claim on a piecemeal basis and only after constant prodding by plaintiffs. Allstate last made a partial payment on July 27, 1977, when it issued its draft in the amount of $3308.28 and has since failed and refused to make any further payment on the claim, although numerous requests have been made upon defendant to honor its obligation.

In deliberately and unjustifiably refusing to honor plaintiffs' repeated demands for payment of the insurance proceeds, Allstate engaged in an unwarranted and unconscionable course of conduct, wholly devoid of social utility and calculated to cause great anguish and severe distress and disturbance of plaintiffs' mental tranquility.

Allstate had notice and knew, or had reason to know, of the existence of each and every circumstance and fact alleged. As a direct and proximate result of the foregoing wrongful acts, plaintiffs were caused to suffer and have suffered severe emotional distress, and plaintiffs were deeply disturbed and harmed by defendant's unwarranted refusal to pay them or the parties who furnished services to plaintiffs.

Attached to and incorporated in count II are several letters. One was from Allstate to the Department of Insurance of the State of Illinois, dated May 5, 1977. It stated:

"In response to Mr. Tobolt's inquiry, we have again reviewed our file.

Regarding the loss in general, I refer you to our letter of March 23, 1977, a copy of which is attached.

As you are now aware, Mr. Tobolt assigned 'Worldwide Public

Adjusters' to represent his interest in this loss. This firm was also contracted with by Mr. Tobolt to repair his home and handle his contents loss, which they did.

The home in question was made liveable on or before June 20, 1976. At that time, Mr. Tobolt was informed by both Mr. Simon, his Public Adjuster, and the Allstate Insurance Co. that the home was liveable. Mr. Tobolt refused to take up residency and was advised by Worldwide Adjusters, as well as Allstate Insurance, that no additional living expenses would be paid beyond June 20, 1976.

Repairs to Mr. Tobolt's dwelling were made by Worldwide Construction Co. They are actually a part of Worldwide Public Adjusting and has been engaged by Mr. Tobolt rather than Allstate. This firm was paid by Allstate Insurance Co. on June 4, 1976, and they have returned to us notarized Proofs of Loss for the loss and damage. Any repairs which were not completed or which were completed improperly would appear to be the responsibility of Mr. Simon and the Worldwide Construction Co.

Relative to the contents items, I again refer you to my letter of March 23, 1977. Mr. Tobolt's Public Adjuster contracted to have cleaned the items that Mr. Tobolt refers to. Ruby Cleaners picked up these items under instructions and directions from Mr. Simon and Mr. Tobolt, and they eventually billed Allstate accordingly. Duplicates are attached. Please note pages 1 and 2 concerning the coats, sheets and pillow cases. We believe that Mr. Tobolt should contact his Public Adjuster concerning these items as we have already paid these bills.

Mr. Tobolt contracted with an assigned Worldwide Adjusters to represent his interests in this matter, for which he paid them a fee. We have had repeated contacts with Mr. Tobolt and Mr. Simon and feel that we have satisfied our obligation under the policy. It would appear that the proper recourse for Mr. Tobolt would be to contact Mr. Simon and resolve with him any problems that he is having with Worldwide Adjusters or Worldwide Construction.

I trust the above will be sufficient to close your file on this matter."

Another was a letter from the Department of Insurance to plaintiff Vance Tobolt, dated May 20, 1977. It stated:

"Enclosed please find the most recent correspondence we have received from the above captioned company. The company is continuing to maintain that you directed your public adjuster to remove the clothing and other articles. If this is in fact true, then Allstate has no responsibility whatsoever for any items that were lost by the cleaners or by your public adjuster. Also, your contract

does not provide for additional living expense beyond whatever reasonable time it would take to put the property back in order. The fact that someone who is repairing your home did not make it liveable due to their mistakes, there is not coverage under the policy for mistakes of contractors hired by you and your public adjuster. Therefore, they are offering no more than additional living expense up to June 20. If you do not agee with this settlement Allstate has made, your only recourse would be through the courts for their determination as to value of your loss. We regret we are unable to assist you any further in this matter."

A third was a letter from Allstate to plaintiff Vance Tobolt, dated May 25, 1976. It stated:

"I have just received a complete report on your recent inquiry to our Home Office from Mr. Simons, Manager of our Arlington Heights Claim Office.

First of all, please accept my apologies for any misunderstanding or delay which may have been caused by our handling of your loss. It is our intention to give fast, fair claim service to all our customers. We are very sorry if we did not do so in this instance.

Mr. Simons has informed me that his office has met with your representative, World Wide Adjusters, on May 20, 1976. At that meeting, the Public Adjuster was advised to take the necessary steps to clean up the premises and begin repairs. It is my understanding that he has agreed to do so.

I do hope that our final handling was to your complete satisfaction.

Thank you for writing to us, Mr. Tobolt, and bringing your claim to our attention. We appreciate having been given the opportunity of looking into this matter for you."

■■ Taking as true, as we must on a motion to strike and dismiss, the factual allegations of these counts, but not the conclusions of law or facts unsupported by specific facts upon which the conclusions rest (*Pierce v. Carpentier* (1960), 20 Ill. 2d 526, 169 N.E.2d 747), we find that count II does not state a cause of action for intentional infliction of severe emotional distress.

■■ The elements essential to sustain a cause of action for intentional infliction of mental distress are stated in *Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 89—90, 360 N.E.2d 765:

" * * * First, the conduct must be extreme and outrageous. The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions or trivialities. 'It has not been enough that the defendant has acted with an intent which is

tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency * * * .' Restatement (Second) of Torts, sec. 46, comment d (1965).

Second, infliction of emotional distress alone is not sufficient to give rise to a cause of action. The emotional distress must be *severe*. Although fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term 'emotional distress,' these mental conditions alone are not actionable. 'The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity.' Comment *j*. See also Prosser, Law of Torts sec. 12, at 54 (4th ed. 1971).

Third, reckless conduct which will support a cause of action under the rules stated is conduct from which the actor knows severe emotional distress is certain or substantially certain to result. (Comment *i*.) Liability extends to situations in which there is a high degree of probability that severe emotional distress will follow and the actor goes ahead in conscious disregard of it. Prosser, Law of Torts 60 (4th ed. 1971).

Fourth, as is stated in comment *e*, the extreme and outrageous character of the conduct may arise from an abuse of a position or a relation with another which gives the actor actual or apparent authority over the other or power to affect his interests. This interpretation of the rule is applicable to collecting creditors and would apply to a creditor in its attempt to collect a lawful obligation."

Whether conduct can be characterized as extreme and outrageous depends on the facts in each case. (*Knierim v. Izzo* (1961), 22 Ill. 2d 73, 174 N.E.2d 157.) A mere statement that an act was done with a certain purpose or intent, without a statement of facts showing such purpose or intent, is a conclusion of law. *Bergeld v. Stork* (1972), 7 Ill. App. 3d 486, 288 N.E.2d 15; *Urfer v. Country Mutual Insurance Co.* (1978), 60 Ill. App. 3d 469, 376 N.E.2d 1073, *appeal denied* (1978), 71 Ill. 2d 616.

In *Debolt v. Mutual of Omaha* (1978), 56 Ill. App. 3d 111, 371 N.E.2d 373, *appeal denied* (1978), 71 Ill. 2d 602, the court affirmed the dismissal of a count seeking damages for intentional infliction of emotional distress. Plaintiff had purchased a disability income policy from defendant.

Subsequently plaintiff became totally disabled. Plaintiff alleged that defendant, even though cognizant of his physical incapacity and financial problems, nevertheless engaged in a course of conduct which should be classified as malevolent or grossly oppressive. Such conduct consisted of the defendant's delayed payments of disability income to plaintiff and the ultimate cessation of any payments to him, which forced him to employ counsel and to file a lawsuit. Plaintiff further alleged that defendant instituted a policy of shuffling plaintiff's claim file between its Illinois office and its home office in Nebraska which effectively confused and frustrated plaintiff in his efforts to secure his disability benefits. Further allegations of plaintiff were to the effect that agents of defendant instilled in him the thought that his life was in jeopardy and when the disability benefits were substantially in arrears defendant offered to repurchase the contract of insurance at an unconscionably low figure.

In affirming, the court stated (56 Ill. App. 3d 111, 113—14):

"The plaintiff has failed to allege specific facts which could be interpreted as outrageous conduct on the part of the defendant or which would substantiate the plaintiff's allegation that he suffered severe or extreme emotional distress.

The specific facts pleaded by the plaintiff are that the defendant ultimately denied liability under the disability policy, that it referred the plaintiff's claim from its Illinois office to its Nebraska office, and that it offered to settle a disputed claim with the plaintiff in return for a surrender of the policy. We do not deem such conduct on the part of the defendant to be so oppressive or outrageous as to support the tort of infliction of severe emotional distress. In the case of *Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 360 N.E.2d 765, the plaintiff alleged with detailed specificity certain acts of the defendant that were far more abusive and intolerable than those alleged in the instant case, yet our supreme court found that they failed to state a cause of action for the tort of intentional infliction of severe emotional distress. We conclude that as to count III the trial court properly granted the defendant's motion to dismiss the same."

The allegations of count II and the correspondence incorporated in it show that the only dispute between plaintiffs and Allstate was the amount of the adjustment and the amount owing them. No facts are alleged showing how Allstate's adjustment of the fire loss constituted outrageous conduct by Allstate. See *Jamieson v. American National Safe Deposit Co.* (1971), 133 Ill. App. 2d 647, 273 N.E.2d 741, *appeal denied* (1971), 48 Ill. 2d 593, *cert. denied* (1972), 405 U.S. 990, 31 L. Ed. 2d 457, 92 S. Ct. 1256.

In *Neuberg v. Michael Reese Hospital & Medical Center* (1978), 60

Ill. App. 3d 679, 377 N.E.2d 215, the court sustained the dismissal of a suit seeking damages for the intentional infliction of severe emotional distress. In that case, defendants had given plaintiffs' children X-ray treatments for enlarged tonsils. These were treatments widely used. Later, thyroid cancer developed. The court held that plaintiffs' complaint failed to allege extreme or outrageous conduct by defendants which was beyond all possible bounds of decency. In addition, the court pointed out (60 Ill. App. 3d, 679, 685):

> " * * * Considered with the second element of the cause of action as outlined in *Davis*, plaintiffs cannot reasonably contend that defendants knew that severe emotional distress was 'certain or substantially certain' to result from defendants' alleged acts in 1947. (*Public Finance Corp. v. Davis* (1977), 66 Ill. 2d 85, 90, 360 N.E.2d 765, 767.) See also *Benza v. Shulman Air Freight* (1977), 46 Ill. App. 3d 521, 524, 361 N.E.2d 91, 93."

In the case before us, plaintiffs cannot "reasonably contend" that Allstate "knew that severe emotional distress was 'certain or substantially certain' to result from" Allstate's acts.

Plaintiffs rely on *Ledingham v. Blue Cross Plan* (1975), 29 Ill. App. 3d 339, 330 N.E.2d 540, *reversed on question of costs* (1976), 64 Ill. 2d 338, 356 N.E.2d 75. There, defendants refused payment of medical and hospital bills on the ground that the condition from which plaintiff suffered came within an exclusion for pre-existing illnesses. Plaintiff sued for wilful and wanton conduct, asking actual and punitive damages, and for breach of contract, asking compensatory damages. Defendants did not accuse plaintiff of a misrepresentation of her condition; nor did they attempt to settle based on defenses known to be untrue. They merely refused payment on a claim which they believed to be excluded by an exemption for pre-existing illnesses. The court stated the issue to be "whether punitive damages may properly be awarded in an action brought by a policyholder of a health insurance plan where the insurance company allegedly wrongfully denied benefits to the insured on the basis of a preexisting illness exclusion in the policy."

The court recognized the tort of intentional infliction of emotional distress, but held that the insured had failed to prove a case against defendant insurer where it appeared that defendant's decision to deny benefits was made in good faith on the basis of the insured's doctor's statement, that the method of communicating that decision to plaintiff and the behavior of the company was not "outrageous" and that defendant did not engage in attempts to "settle" based upon defenses which were known to be untrue. In the present case, defendant adjusted the loss based upon its own investigation and the independent

investigation of plaintiffs' public adjuster. In addition, plaintiffs' complaint contains no allegations of bad faith "settlement" negotiations or outrageous conversations with plaintiffs.

In *Eckenrode v. Life of America Insurance Co.* (7th Cir. 1972), 470 F.2d 1, relied on by plaintiffs, defendant's refusal to pay accidental death benefits was based on a bad faith insistence on a nonexistent defense. The court held that refusal to pay, under circumstances where plaintiff's need for proceeds was great and defendant's duty to pay was clear, could constitute extreme and outrageous conduct and entitle plaintiff to recover for severe emotional distress. The court, however, was careful to point out that "settlement tactics may be privileged under circumstances where an insurer has done no more than insist upon his legal rights in a permissible way." 470 F.2d 5.

From the correspondence attached to plaintiffs' amended complaint, it is apparent that Allstate was only "insisting upon its legal rights in a permissible way."

*Crisci v. Security Insurance Co.* (1967), 66 Cal. 2d 425, 426 P.2d 173, 58 Cal. Rptr. 13, also relied upon by plaintiffs, was explained in *Gruenberg v. Aetna Insurance Co.* (1973), 9 Cal. 3d 566, 510 P.2d 1032, 108 Cal. Rptr. 480. The court there pointed out that where other interests have been involved, mental distress may be an element of damages not requiring "outrageous" conduct or "severe" mental distress, but that where the claim is for the independent tort of intentional infliction of emotional distress the conduct must be "outrageous" and the emotional distress "severe." In *Crisci*, other interests were invaded.

■ Plaintiffs' claim in count II was solely for the intentional infliction of severe emotional distress. The conduct there alleged falls "short of the extreme and outrageous conduct necessary to sustain a cause of action for intentional infliction of emotional distress." (*Knierim v. Izzo* (1961), 22 Ill. 2d 73, 174 N.E.2d 157; *Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 360 N.E.2d 765; *Farnor v. Irmco Corp.* (1979), 73 Ill. App. 3d 851, 392 N.E.2d 591. The trial court's striking and dismissal of count II was correct.

Count III, for compensatory and punitive damages for the failure of Allstate to act in good faith in dealing with plaintiffs, alleged:

Allstate falsely, fraudulently and deceitfully represented in its policy that it would pay the proceeds which it was obligated to pay under the policy upon receipt of due written proof of loss of the fire damage to the building and personal property. It also promised to pay for additional living expenses if the property loss rendered the premises untenantable, knowing full well it would not pay the proceeds upon receipt of due written notice of claim and the required proof of loss.

Plaintiffs also relied upon the "Pledge" made by Allstate whereby it promised it would "* * * continue to pioneer higher quality protection and better value insurance for your family, home and car" and upon the statement by Allstate that "You're in Good Hands with Allstate."

Allstate, knowing full well of plaintiffs' dire need for the proceeds of the insurance and knowing that plaintiffs could not legally enforce payment of said proceeds of insurance without a lawsuit and the expense involved, applied economic coercion to plaintiffs by refusing to pay the full amount due under the policy. Allstate was guilty of one or more of the following wanton or willful acts or omissions committed or omitted with reckless disregard of the consequences: wantonly, willfully, maliciously, recklessly or intentionally and in bad faith (a) refused to pay for fire damage to the dwelling for an undue period of time, until about May 20, 1976, and did not actually pay any money to the contractor hired to do the work of repair until about June 4, 1976, when it knew or should have known that said contractors would not commence any repairs without the payment of funds; (b) refused to pay sufficient funds for the fire damage caused to plaintiffs' dwelling when it knew or should have known that without sufficient funds the contractor hired to do the repairs would be unable to repair the dwelling properly; (c) refused to pay a sufficient amount of money to cover the additional living expenses as provided in the policy, and refused to pay any amount beyond June 20, 1976, in spite of the fact that it had not given its approval to repair the dwelling until May 20, 1976, and had not issued its draft to the contractor for repairs until June 4, 1976; (d) refused for an undue length of time to pay anything toward the personal property and other contents destroyed in the fire, when it knew or should have known that plaintiffs were in need of money to purchase clothing and other items; (e) refused to pay sufficient funds for the fire damage to the personal property in plaintiffs' dwelling, and has otherwise delayed in making payment, choosing instead to pay the claim on a piecemeal basis, when it knew or should have known that said conduct would make it impossible for plaintiffs to set up housekeeping in a normal fashion.

Because plaintiffs objected to the action of Allstate, plaintiffs were notified that defendant would not renew the policy of insurance.

As a direct and proximate result of one or more of the above mentioned willful, wanton, malicious, reckless or intentional acts of defendant, plaintiffs were injured in that their home has depreciated in value and they have become indebted to pay various bills, including one for additional living expenses, which they are not able to pay.

The willful, wanton, malicious, reckless and intentional acts or omissions on the part of defendant were committed under circumstances

which require the imposition of exemplary damages in order to deter others from committing the same willful, wanton, malicious, reckless and intentional acts or omissions.

Taking as true the factual allegations of count III, we hold that it was also properly stricken and dismissed.

Plaintiffs' claim for punitive damages is predicated on *Ledingham v. Blue Cross Plan* (1975), 29 Ill. App. 3d 339, 330 N.E.2d 540, *reversed on question of costs* (1976), 64 Ill. 2d 338, 356 N.E.2d 75. That case, relying on California law, held that malicious conduct by an insurer in breaching a contract may give rise to an independent willful tort and the recovery of punitive damages. *Debolt v. Mutual of Omaha* (1978), 56 Ill. App. 3d 111, 371 N.E.2d 373, *appeal denied* (1978), 71 Ill. 2d 602, holds to the contrary.

In *Debolt*, discussed above, plaintiff in another count also sought punitive damages for a breach of duty of good faith and fair dealing. That count was dismissed and the dismissal was affirmed by the Third District Appellate Court. The court said (56 Ill. App. 3d 111, 114-17):

"An exception to the rule that punitive damages are not recoverable in contract actions is to be found in the case of *Ledingham v. Blue Cross Plan for Hospital Care* (1975), 29 Ill. App. 3d 339, 330 N.E.2d 540. In *Ledingham* the appellate court from the fifth Appellate Court District held that a breach of contract itself may constitute an unusual case where an independent wilful tort will be found and that punitive damages may be recovered.

We have carefully examined the case of *Ledingham* and after such examination do not feel constrained to accept the result reached as being precedental in the instant case.

We reach this conclusion for several reasons.

        \* \* \*

In *Ledingham* the reviewing court also relied on a number of California cases as authority for an award of punitive damages for a breach of good faith and fair dealing on the part of an insurer in his relationship with its insured. We will make some observations concerning the California cases as we set forth an additional reason why we do not deem the case of *Ledingham v. Blue Cross Plan for Hospital Care* (1975), 29 Ill. App. 3d 339, 330 N.E.2d 540, as being dispositive of the instant case.

We consider it to be of considerable import in the instant case that our State legislature has provided a remedy to insureds where an insurance company's refusal to pay or honor its contract is unreasonable and vexatious. Section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1975, ch. 73, par. 767) permits an insured to recover attorney fees (25% of the amount the plaintiff is entitled to

recover or $1,000 or whichever is the less) if it appears to the court that the insurer's refusal to pay is vexatious and without reasonable cause. This statutory provision has been the law in our State since 1967.

We are of the opinion that the legislature has intended to provide a remedy to an insured who encounters unnecessary difficulties with an unreasonable and vexatious insurance company. The insured can maintain an action on the contract for recovery of withheld policy benefits and upon proper finding by the court can be awarded attorney fees in addition to all other costs. Where the legislature has provided a remedy on a subject matter we are not only loath but in addition harbor serious doubts as to the desirability and wisdom of implementing or expanding the legislative remedy by judicial decree. [Citing *Cunningham v. Brown* (1961), 22 Ill. 2d 23, 174 N.E.2d 153, and *Hall v. Gillins* (1958), 13 Ill. 2d 26, 147 N.E.2d 352.] * * *

We readily acknowledge that the courts throughout our nation have been busy for several decades making new inroads in the law of tort, however, we do not deem the making of law by judicial decree to be a desirable practice per se but should be limited to instances when humanitarian needs dictate the necessity of judicial action or when legislative bodies for an unreasonably long time refuse to enact statutory law for the purpose of coping with an enduring and festering problem. In the instant case there is statutory law of long duration which was enacted to assist an insured as against an unreasonable and vexatious insurer.

As we have previously stated, in the case of *Ledingham* the reviewing court in arriving at its decision relied upon a number of California cases. We believe it to be of significance that there is no statutory provision in California such as that in Illinois (Ill. Rev. Stat. 1975, ch. 73, par. 767) which permits an insured to recoup his attorney fee expenses where an insurer's refusal to pay has been vexatious and unreasonable. It could well be argued that the rationale of the California courts is that absent a statutory remedy punitive damages will be allowed to an aggrieved party who has been mistreated by an insurer. In the case of *Ledingham* the reviewing court saw fit to make no reference to the statutory remedy in our State which is available to an aggrieved insured. We believe the remedy provided in section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1975, ch. 73, par. 767) is highly significant in that it provides a remedy for an insured and thereby attempts to keep him harmless resulting from the misconduct of his insurer. It may well be that the statutory remedy should provide greater

relief but we hold that to be a matter for legislative determination. For the reasoning set forth we do not believe that the instant case should be determined by the decision in *Ledingham v. Blue Cross Plan for Hospital Care* (1975), 29 Ill. App. 3d 339, 330 N.E.2d 540, and we further conclude that the trial court correctly dismissed count II of the plaintiff's complaint."

As the court in *Debolt* pointed out, California has no statute similar to section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1975, ch. 73, par. 767). The opinions from the cases from other States upon which plaintiffs also rely make no reference to any such statute. *Kirk v. Safeco Insurance Co.* (1970), 28 Ohio Misc. 44, 273 N.E.2d 919; *Wright v. Public Savings Life Insurance Co.* (1974), 262 S. C. 285, 204 S.E.2d 57; *Rex Insurance Co. v. Baldwin* (1975), 163 Ind. App. 308, 323 N.E.2d 270; *Vernon Fire & Casualty Insurance Co. v. Sharp* (1974), 161 Ind. App. 413, 316 N.E.2d 381; *Standard Life Insurance Co. v. Veal* (Miss. 1977), 354 So. 2d 239.

In *Urfer v. Country Mutual Insurance Co.* (1978), 60 Ill. App. 3d 469, 376 N.E.2d 1073, *appeal denied* (1978), 71 Ill. 2d 616, the Fourth District Appellate Court affirmed the dismissal of a complaint sounding in tort for compensatory and punitive damages and alleging a willful refusal to pay. It cited *Debolt* as holding that the legislature had by section 155 established a remedy in cases where it was alleged that a refusal to pay was unreasonable and vexatious. Mr. Presiding Justice Mills, concurring in part and dissenting in part, said (60 Ill. App. 3d 469, 475-76):

"But the question of punitive and compensatory damages in tort for a wilful refusal to pay under a contract does give me concern. I have weighed and compared *Ledingham* and *Debolt*, by the pound and by the paragraph, and finally conclude that the opinion in *Debolt* is more sound and more persuasive. It strikes me that statutory causes of action, being creatures of the legislative branch, should be viewed with judicial restraint. The *Debolt* rationale of legislative preemption in this area—by recovery of reasonable and limited attorney's fees—is cogent and convincing. Adequate remedy? Perhaps not. But as was said by the *Debolt* court, 'It may well be that the statutory remedy should provide greater relief but we hold that to be a matter for legislative determination.' 56 Ill. App. 3d 111, 117, 371 N.E.2d 373, 378.

Any further words would be overkill. It will suffice to conclude that I agree to affirm because there can be no tortuous recovery on a contract beyond the statutory prescriptions, the legislature having preempted the field."

■■ We agree with the reasoning of both *Debolt* and *Urfer* and hold that by section 155 the legislature has pre-empted the field.

We also note that in 1977 the legislature agreed that section 155 had

pre-empted the field when it amended that section to increase the recovery for vexatious delay (Ill. Rev. Stat. 1977, ch. 73, par. 767):

"* * * the court may allow as a part of the taxable costs in the action reasonable attorney fees, other costs, *plus* an amount not to exceed any one of the following amounts:

* * *

(b) $5,000." (Emphasis added.)

Plaintiffs argue, however, that the heading of section 155 "Attorney Fees" is conclusive that this section was not intended by the legislature as a bar to a common law action for punitive damages. We do not agree.

"* * * In the interpretation of the meaning of a particular section the plain meaning of the substantive provisions of the section cannot be limited by its heading. *Railroad Trainmen v. B. & O. R. Co., 331 U.S. 519.* * * *" *People v. Trigg* (1968), 97 Ill. App. 2d 261, 270, 240 N.E.2d 130, *appeal denied* (1968), 39 Ill. 2d 626.

It is clear to us from the legislature's action in 1977 and from *Debolt* and *Urfer* that section 155 was concerned with damages for vexatious delay and not with attorney fees as such. To the extent that *Eckenrode v. Life of America Insurance Co.* (7th Cir. 1972), 470 F.2d 1, may be considered to hold to the contrary with reference to section 155, it is not binding upon Illinois courts. *City of Chicago v. Groffman* (1977), 68 Ill. 2d 112, 118, 368 N.E.2d 891.

*Gould v. Country Mutual Casualty Co.* (1962), 37 Ill. App. 2d 265, 185 N.E.2d 603, and *Freed v. The Travelers* (7th Cir. 1962), 300 F.2d 395, relied on by plaintiffs, are not in point. They were concerned with cases where a plaintiff was claiming as damages in a breach situation, the litigation expenses (including attorney's fees) which he incurred in a suit by a third party where such suit was caused by defendant's breach. This differs from the matter before us. There was no suit by a third party.

Plaintiffs cite the provisions of section 154.6 and its predecessor (Ill. Rev. Stat. 1977, ch. 73, par. 766.6), defining an improper claims practice as "(d) Not attempting in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear" as showing that the legislature by it has expressly ratified the cause of action attempted to be stated in Count III. We disagree. That section is a definition section. It provides no remedy. Section 155 does.

But even if section 155 were not a bar to plaintiffs' action, the allegations of count III are insufficient to state a cause of action for bad faith or vexatious conduct. The allegations that defendant's acts were willful, wanton, malicious, reckless, intentional or in bad faith are not factual allegations; nor are they supported by factual allegations. There are no alleged threatened and actual bad faith refusals to pay, or false or threatening communications from Allstate for the purpose of causing

plaintiffs to disadvantageously settle a nonexistent dispute. The complaint shows an ongoing process of adjustment of plaintiffs' claimed loss and admits that there was a bona fide dispute. There is no allegation that Allstate has asserted nonexistent defenses clearly contrary to the provisions of the policy to minimize plaintiffs' claim. Reading the complaint as a whole, it is clearly apparent that Allstate was only insisting on its legal rights under the terms of the policy in adjustment of plaintiffs' claim.

Count III fails to allege sufficient facts to state a cause of action for bad faith or vexatious conduct. The trial court's striking and dismissal of count III was correct.

The judgment of the circuit court of Cook County is affirmed.

Affirmed.

McGLOON and CAMPBELL, JJ., concur.