**ABBOTT LABORATORIES, et al., Plaintiffs,**

v.

**GRANITE STATE INSURANCE CO., Defendant.**

**No. 80 C 2897.**

United States District Court, N.D. Illinois, E.D.

Sept. 14, 1983.

Judith A. Royal, Lord, Bissell & Brook, Chicago, Ill., for plaintiffs.

Elizabeth Pendzich, John J. Witous, Clausen, Miller, Gorman, Caffrey & Witous, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Abbott Laboratories and Abbott Laboratories International Company (collectively "Abbott" in the singular) has brought this four-count diversity action challenging the refusal by its insurer, Granite State Insurance Company ("Granite"), to indemnify Abbott for certain insured losses:

1. Count I is a contractual claim for the amount due on the insurance policy.

2. Count II is based on Illinois Insurance Code § 155 ("Section 155"), Ill.Rev. Stat. ch. 73, § 767, which permits certain extraordinary costs to be taxed against an insurer that vexatiously and unreasonably refuses to pay: attorneys' fees plus an additional amount not to exceed any of the three ceiling amounts prescribed in Section 155.

3. Count III purports to be a tort claim seeking compensatory and punitive damages for Granite's wilful refusal to pay—a breach of its duty of good faith and fair dealing towards insureds.

4. Count IV characterizes Granite's assertedly vexatious and unreasonable refusal to pay as an "improper claims practice" proscribed by Illinois Insurance Code § 154.6 ("Section 154.6"), Ill.Rev. Stat. ch. 73, § 766.6, and seeks punitive damages under that provision.

Granite has now moved to dismiss Counts III and IV for failure to state a claim. For the reasons stated in this memorandum opinion and order, its motion is granted.

### Count III

Granite contends Section 155[1] has displaced the common law tort remedy for vexatious delay asserted in Count III. As this Court explained in *Evaluation Systems, Inc. v. Aetna Life Insurance Co.*, 555 F.Supp. 116, 120 (N.D.Ill.1982), the Illinois Appellate Courts are sharply divided on that issue:

> Without even addressing the preemptive implications of the statutory remedy, the Fifth District Appellate Court recognized

1. As amended in 1977, Section 155 provides: In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:
   (a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;
   (b) $5,000;
   (c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action. Originally (before 1977) Section 155 made insurers whose refusal to pay a claim was "vexatious and without reasonable cause" liable *only* for "reasonable attorney's fees" not to exceed any of three prescribed amounts: the first and third ceiling amounts were identical to subparagraphs (a) and (c) in the current statute, while the second maximum amount was only $500.

an independent tort action against insurers for breach of their implied duty of good faith and fair dealing. *Ledingham v. Blue Cross Plan for Hospital Care,* 29 Ill.App.3d 339, 330 N.E.2d 540 (5th Dist.1975). *Ledingham* has had a mixed reception in the other Illinois Appellate districts. Both the First and Third Districts have disapproved of *Ledingham,* concluding the original Section 155 foreclosed any judicial enhancement (via common law tort remedy) of recovery for vexatious delay. *Tobolt v. Allstate Insurance Co.,* 75 Ill.App.3d 57 [30 Ill.Dec. 824], 393 N.E.2d 1171 (1st Dist.1979); *Debolt v. Mutual of Omaha,* 56 Ill. App.3d 111 [13 Ill.Dec. 656], 371 N.E.2d 373 (3d Dist.1978). *Tobolt* also found the 1977 amendment to Section 155 (its current version) also manifested a legislative intent to preempt the field. However the Fourth District has endorsed the availability of *Ledingham*'s tort remedy in cases to which the amended Section 155 cannot be retroactively applied (it has not yet ruled whether the present Section 155 has preemptive effect). *Lynch v. Mid-America Fire & Marine,* 94 Ill.App.3d 21 [49 Ill.Dec. 567], 418 N.E.2d 421 (4th Dist.1981). And the Second District has said a tort remedy for compensatory damages may lie despite Section 155. *Hoffman v. Allstate Insurance Co.,* 85 Ill.App.3d 631 [40 Ill. Dec. 925], 407 N.E.2d 156 (2d Dist.1980).

■ Employing the "Supreme Court-predictive" approach to the *Erie* problem posed by that split of authority, this Court's colleague Judge Marshall recently concluded Section 155 did not preempt the *Ledingham* tort. *Kelly v. Stratton,* 552 F.Supp. 641 (N.D.Ill.1982). However, for the reasons expounded at length in *Commercial Discount Corp. v. King,* 552 F.Supp. 841, 847–52 (N.D.Ill.1982), this Court perceives its *Erie* obligations differently. In this Court's view *Erie* (as amplified in *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61

S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941)) demands adherence to the Illinois "internal" choice of law rule that binds a state trial court to the decisions of the Appellate Court *in its own district* when the Appellate Courts diverge. In this case, this Court sits in the same position as a Cook County Circuit Judge in the First Appellate District, for the Illinois venue statute (Ill. Rev.Stat. ch. 110, § 2–101) would have permitted Abbott to sue Granite (a foreign corporation) in Cook County.[2] Consequently the position taken by the First Appellate District in *Tobolt* is dispositive here: Section 155 preempts any tort remedy for vexatious and unreasonable refusal to pay insurance proceeds. Count III must therefore be dismissed.

### Count IV

■ *Tobolt,* 75 Ill.App.3d at 71, 30 Ill. Dec. at 834, 393 N.E.2d at 1181 also spells the demise of Count IV by refusing to find any private right of action for violations of Section 154.6:

> Plaintiffs cite the provisions of section 154.6 and its predecessor (Ill.Rev.Stat. 1977, ch. 73, par. 766.6), defining an improper claims practice as
>
> > (d) not attempting in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear,
>
> as showing that the legislature by it has expressly ratified the cause of action [for the insurer's breach of its duty to deal in good faith with its insureds]. We disagree. That section is a definition section. It provides no remedy. Section 155 does.

No other Illinois appellate court appears to have addressed the issue. Under *Erie* principles that should settle the matter in Granite's favor.

Abbott nonetheless urges an implied right of action is maintainable under *Sawyer Realty Group, Inc. v. Jarvis Corp.,* 89

---

**2.** See the Appendix for a brief recapitulation (supplementing the *Commercial Discount* appendix) of the policy reasons underlying the

difference between this Court's adherence to *Erie* and Judge Marshall's approach.

Ill.2d 379, 59 Ill.Dec. 905, 432 N.E.2d 849 (1982). On the contrary, proper analysis of the *Sawyer* standard governing judicial recognition of an implied right of action fortifies *Tobolt* and defeats Abbott (89 Ill.2d at 386, 59 Ill.Dec. at 908, 432 N.E.2d at 852; emphasis added, citations omitted):

> It is clear that it is not necessary to show a specific legislative intent to create a private right of action. If there is no indication that the remedies available are only those the legislature expressed in the Act, then where it is consistent with the underlying purpose of the Act and *necessary to achieve* the aim of the legislation, a private right of action can be implied.... The court looks to the totality of circumstances in endeavoring to discover legislative intent.

No doubt authorizing private suits under Section 154.6 would be "consistent with" its underlying purpose of protecting insureds. But a private remedy is scarcely "necessary" to further that purpose. As *Tobolt* indicated, insureds can resort to Section 155 to redress any injury flowing from the insurer's vexatious refusal to pay. Section 155's ceilings on the penalty (a form of punitive damages) assessed for vexatious conduct reflect the Illinois General Assembly's judgment as to the necessary insurer's incentive to refrain from such conduct. If anything, such limitations on punitive damages militate against a finding of legislative intent to permit private actions under Section 154.6, for those constraints would otherwise be rendered nugatory.[3] Finally, Illinois Insurance Code § 154.8, Ill.Rev.Stat. ch. 73, § 766.8, empowers the Illinois Director of Insurance to issue cease and desist orders to any insurer who commits any "improper claims practice" enumerated in Section 154.6.

### Conclusion

Granite's motion to dismiss Counts III and IV is granted.

### Appendix

Debates begin to grow tiresome even to the debaters (let alone the audience) whenever the debaters begin to repeat themselves.[1] But so long as the ongoing efforts to eliminate (or to impose significant curbs on) federal diversity jurisdiction do not bear fruit, definition of the federal courts' proper role in diversity cases remains highly important. And when so ordinarily thoughtful a jurist as this Court's colleague Prentice Marshall can fall victim to what this Court sees as flawed analysis in this area, this Court may perhaps be pardoned a further brief response. This Appendix will not deal chapter and verse with Judge Marshall's *Roberts* opinion, for a few salient points (supplementing this Court's *Commercial Discount* discussion) should suffice.

As a preliminary matter, this Court is of course keenly mindful that *Erie v. Tompkins* may forcefully be argued to undercut the Supremacy Clause. It does reduce the independent judging function of federal courts (including the Supreme Court) in diversity cases—the obligation to *decide* "cases" and "controversies"—to the task of slavish adherence to state court doctrine.[2] But because this Court "writ[es] on

---

**3.** And of course decisions by the Illinois *legislature* are equally part of the law to which *Erie* mandates this Court's adherence in a diversity action.

**1.** See *Kelly v. Stratton,* 552 F.Supp. 641, 644–45 (N.D.Ill.1982) (Marshall, J.); *Commercial Discount Corp. v. King,* 552 F.Supp. 841, 847–52 (N.D.Ill.1982) (Shadur, J.); *Roberts v. Western-Southern Life Ins. Co.,* 568 F.Supp. 536, 539–45 (N.D.Ill.1983) (Marshall, J.).

**2.** See 2 Crosskey, *Politics and the Constitution in the History of the United States* ch. XXVI, and particularly at 916–19 ff. (1953). As Professor Crosskey has also pointed out (*id.* at ch. XX–XXI), under a reading that the term "Laws" included the "Common Law" as well as legislation—a construction his research found would accurately reflect the conventional usage when the Constitution was written—a federal decision on any substantive common law question would then become binding on all state courts. Failure or refusal of a state court to follow that decision would then pose a federal question. As a consequence, what the Commissioners on Uniform Laws have been trying to do by suasion (with greater or lesser success) would long since have been accomplished as a matter of common

the shores of Lake Michigan rather than the banks of the Potomac,"[3] *Erie* and its progeny must be followed. What does that mean to the litigant?

Any proper response to that inquiry requires answering just *why* federal courts are obliged under *Erie* to apply state substantive law in disputes between diversity-of-citizenship adversaries. *Erie* itself supplies the answer (304 U.S. at 74–75, 58 S.Ct. at 820–821):

> Diversity of citizenship jurisdiction was conferred in order to prevent apprehended discrimination in state courts against those not citizens of the State. *Swift v. Tyson* introduced grave discrimination by non-citizens against citizens. It made rights enjoyed under the unwritten "general law" vary according to whether enforcement was sought in the state or in the federal court; and the privilege of selecting the court in which the right should be determined was conferred upon the non-citizen. Thus, the doctrine rendered impossible equal protection of the law. In attempting to promote uniformity of law throughout the United States, the doctrine had prevented uniformity in the administration of the law of the State.

Accord, *Guaranty Trust Co. v. York,* 326 U.S. 99, 109, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079 (1945):

> The nub of the policy that underlies *Erie R. Co. v. Tompkins* is that for the same transaction the accident of a suit by a non-resident litigant in a federal court instead of in a State court a block away should not lead to a substantially different result.

Exactly the same idea was put succinctly in *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941) (treating choice-of-law rules as substantive, not procedural, for *Erie* purposes):

> Otherwise, the accident of diversity of citizenship would constantly disturb equal administration of justice in coordinate state and federal courts sitting side by side.

If that concept of "equal administration of justice" is to have any meaning at all, it must mean the diversity plaintiff or defendant in the federal court system is required to be placed in as near a position as possible to the state court plaintiff or defendant asserting a like claim or defense.

From that perspective the most curious, and most troublesome, aspect of *Roberts* lies in Judge Marshall's total failure to discuss the *Thorpe-Garcia* dichotomy,[4] which under *Erie* and *Klaxon* is just as binding on us as any other Illinois choice-of-law, or other substantive law, rule. By what right may we federal judges ignore that clear and binding directive as to which Appellate Court decision to follow in case of conflict? Or is Judge Marshall somehow exercising the "predictive" approach sub silentio and deciding, despite any contrary indications from *any* Illinois appellate court at any level, that the Illinois Supreme Court would disapprove the rules enunciated in *Thorpe* and *Garcia?*

That really ought to end the·debate before it begins. It is really not this Court's doctrine, but that of the Illinois courts, with which Judge Marshall's analysis quarrels. And one of the restraints *Erie* impos-

---

law. Whether or not that result (adhering to *Swift v. Tyson,* not *Erie* ) would be historically sound depends on the scholarly debate, which is worth reading. Whether or not the result would be desirable depends on one's notions of federalism.

**3.** *Vail v. Board of Education of Paris Union School District No. 95,* 706 F.2d 1435, 1445 (7th Cir.1983) (Eschbach, J., concurring).

**4.** As stated in *Commercial Discount,* 552 F.Supp. at 848 (emphasis in original):

> Illinois' "internal" choice of law rule is that a state trial court is *bound* by the decisions of all the intermediate Appellate Courts, but is bound by the Appellate Court *in its own district* when the Appellate Courts differ. *People v. Thorpe,* 52 Ill.App.3d 576, 579, 10 Ill.Dec. 351, 354, 367 N.E.2d 960, 963 (2d Dist.1977); *Garcia v. Hynes & Howes Real Estate, Inc.,* 29 Ill.App.3d 479, 482, 331 N.E.2d 634, 636 (3d Dist.1975).

And see this Court's further discussion in *Commercial Discount,* 552 F.Supp. at 851 n. 8.

es is to make such a federal quarrel with state rules of law (in this case choice-of-law rules) impermissible. Nonetheless, because *Roberts* has other doctrinal disabilities, this Appendix will proceed to touch on a few.

For the vast majority of Illinois litigants the trial court (the Circuit Court) is the court of last resort. For the remaining small minority the Illinois Appellate Court is almost always the end of the litigation road. Only a comparative handful of cases finds its way to decision by the Illinois Supreme Court.[5] Indeed even in the series of Illinois Appellate Court cases that has generated the specific split among Appellate Districts triggering *Roberts* and this decision—though all five Districts have spoken to the issue and despite extensive law review comment highlighting the problem [6]—more than four years have elapsed since the split of authority first manifested itself, without the Illinois Supreme Court having settled the issue. In the meantime, if the experience in the federal courts is any indication,[7] many litigants have had their rights determined under the present regime. And for those in the state court system, the "present regime" is precisely parallel to what a comparable litigant would receive in this Court, not in Judge Marshall's.

*Roberts* posits a few hypotheticals to buttress its result. Those examples illustrate the possibility, in the Illinois system, that *future* appellate courts may differ with the existing appellate authority that, under Illinois internal choice-of-law rules,[8] the Illinois trial courts *must* follow.[9] That possibility of course exists (though neither Judge Marshall nor this Court is omniscient, so that his acting on that possibility poses a separate risk—if he is wrong in his prediction—that the federal litigant may get a different brand of justice than the Illinois courts would in fact deliver, not only at the trial court level commensurate with our own but at the Illinois Appellate

5. Statistics for calendar year 1982 provided by Honorable Roy Gulley, Director of the Administrative Office of the Illinois Courts, show (hardly a surprise) Illinois state cases resemble the federal judicial system in forming a pyramid, with the Illinois Supreme Court at its apex. There is no retrievable statistic as to the number of cases disposed of at the trial court level via litigation (not trial, but the litigation process) as contrasted with settlement for the sheer sake of dispute disposition. Trial *statistics alone tend* to be misleading, because most settlements are in substantial part a function of the lawyers' perception of where the decided case law puts their clients vis-a-vis the opposing parties. In any event, the total number of 1982 civil case "dispositions" in Illinois trial courts aggregated 706,893 (that figure is not broken down as among trials, settlement and other means of disposition). Only 6,500 civil and criminal cases were "disposed of" by the five coordinate Appellate Districts, 1,446 of those by full opinion and 3,105 under Rule 23 (orders without published opinion). Though the Illinois Supreme Court figures reflected 2,009 civil and criminal cases "disposed of," that figure is not really descriptive of its law-defining activity. Only 199 of those cases involved *opinions.* What is a highly significant figure (comparable to certiorari jurisdiction in the federal system) is that 1468 of the "dispositions" dealt with petitions for leave to appeal from the Appellate Courts, and only 132 of those petitions were allowed (such allowances form part of the grist for the mill of Supreme Court opinions).

6. See most recently Durham, *Section 767 of the Illinois Insurance Code: Does It Preempt Tort Liability?*, 16 J.Mar.L.Rev. 471 (1983), with its review of the schism in the inter-District case law; see also Alexander, *Punitive Damages in Illinois Insurance Cases—Beyond Ledingham, Debolt, and Kelsay*, 70 Ill.B.J. 645 (1982).

7. *Roberts*, 568 F.Supp. at 539 n. 3 identified a number of federal court decisions on the substantive issue. This Court has ruled in several like cases without publishing its opinions, as is likely true of a number of its fellow District Court judges. And of course our District Court cases unquestionably represent only a small fraction of the state court cases presenting the issue.

8. See the discussion in the text at n. 4.

9. One of Judge Marshall's examples rests on the occasional difference of view that emerges between different divisions (i.e., panels) of the First District. Essentially that argument says we in the federal District Court vineyard should be at liberty to do what Illinois *appellate* judges may do but our Illinois *trial* court counterparts may not: flout squarely applicable Appellate Court precedent. Again nothing can justify that unless we are free to reject the conceptual underpinning of *Erie* by disregarding the *Thorpe-Garcia* directives. We are not.

Court level as well![10]). But even granting the possibility of a *future* difference, what Judge Marshall's approach does is to apply to every *present* suitor in a diversity conflict-of-authority situation a wholly different set of rules than the identical suitor would get in the state system. And that disparate treatment is given solely because—on the false assumption that all cases go all the way to the top of the state judicial ladder—the *occasional* litigant *might* obtain a different result under the approach this Court follows (adhering as it does to the Illinois rules governing precedential value).[11]

That universalist approach, exemplified by *Roberts,* is the essence of forum-shopping. It is at war with the reason *Erie* overturned a century of practice under *Swift v. Tyson.* That is why Judge Marshall is simply wrong in saying (*Roberts,* 568 F.Supp. at 539):

> [W]e think that *Commercial Discount* begins with an erroneous premise: that a

either because the Court of Appeals might see the *Erie* function differently from Judge Marshall or because it might seek (via Rule 20 certification) and obtain a corrective opinion from the Illinois Supreme Court. By contrast, again the same litigant in *this* Court would obtain the *identical* result here that would have been provided in the state Circuit Court. If the case were taken up on appeal from this Court, the result in the Court of Appeals would again be identical to what would have been secured in the Illinois Appellate Court (after all, the Appellate Court to which the appeal would be taken would be the same one whose decision had produced the rule of decision followed by this Court—save in the rare instance in which the question would generate an intra-Appellate-District conflict, a situation that cannot be predicted by a federal court any more than by its state Circuit Court counterpart). Alternatively if the Court of Appeals, in the face of the Appellate District conflict, employed the new certification procedure to seek a resolution from the Illinois Supreme Court, the consequence would again be exactly parallel to that confronting the corresponding state court litigant:

> 1. Non-acceptance of the certified question by the Illinois Supreme Court (a matter of discretion) would leave the issue to the Court of Appeals, which would be bound to follow the applicable Appellate Court decision. That represents the precise equivalent of the Illinois Supreme Court's denial of leave to appeal in the state court system, leaving the Appellate Court's decision in force.
>
> 2. Acceptance and resolution of the question at the Illinois Supreme Court level would similarly be exactly comparable to that court's granting leave to appeal (a far less frequent eventuality than its denial) to a state court litigant.

Thus step by step, at every judicial level, the party in this Court is neither advantaged nor disadvantaged vis-a-vis the party with an identical claim or defense in the state courts. Greater faithfulness to *Erie* cannot be accorded, at least given the fact the two judicial systems are separate. That surely cannot be said of Judge Marshall's approach.

10. It may be observed in passing, though it is not critical to the current discussion, that Judge Marshall's "third type of forum shopping permitted by *Commercial Discount*" (*Roberts,* 568 F.Supp. at 541) is a straw man. That third example is of the outmoded state court authority (what Wright, Miller & Cooper, quoted in *Roberts,* call "an ancient or shaky state court decision") that concededly is unlikely to be followed within the state system itself. All of us know the Illinois *trial* courts have greater freedom to make their own way in such situations, just as we in the federal court system need not blindly adhere to higher authority on federal questions if that authority has plainly been overtaken by later developments. But such later developments must be found in the authorities we are bound to follow jurisprudentially, not simply in our view of what may be better. As this Court pointed out in *Commercial Discount,* 552 F.Supp. at 852 n. 9, its decisions in this area have consistently dealt with highly contemporary Illinois authority. In situations like the straw-man example Judge Marshall gives, this Court has done just as *Commercial Discount* n. 9 indicates. Most significant for present purposes, to proceed from such a non-parallel limited example to a general "predictive" rule is a faulty use of the inductive reasoning process.

11. This opinion's analysis is further reinforced by the Illinois Supreme Court's issuance of a new rule (Rule 20, effective October 1, 1983) allowing our Court of Appeals or the United States Supreme Court (but *not* District Courts) to certify questions of law to the Illinois Supreme Court. One of the teachings of *Erie* (after all, both it and its definitive successors were all announced by the Supreme Court itself) is that Courts of Appeal and the Supreme Court are bound to follow state substantive law in diversity cases, just as we are in the District Court (Judge Marshall's speculation to the contrary in *Roberts,* 568 F.Supp. at 542 & n. 11 and 543 & nn. 13 and 15 is unfounded). Under the system adhered to by Judge Marshall, the federal court litigant will get in the federal District Court a different result than he, she or it would obtain in the state Circuit Court, with a potential for change only at the price of an appeal—

federal court sitting in diversity jurisdiction "must decide substantive questions in the same way that *a state trial judge counterpart* sitting at the same location would."

That is not at all a premise, but rather a conclusion—one dictated by the force of *Erie* and the mandate it gives to follow the *Thorpe-Garcia* rules.

Of course it is stifling for a free-spirited federal judge to be relegated to the position of a sounding board for state law—for the federal judiciary to be imprisoned by what we may view as the state law's inadequacies or injustices. However neither that subliminal level of impatience nor the kind of hypotheticals posed by Judge Marshall provides a warrant for indulging in the *Roberts* "solution."