UNR INDUSTRIES, INC., et al., Plaintiffs,

v.

CONTINENTAL INSURANCE COMPANY, et al., Defendants.

No. 83 A 2523, etc.

United States District Court, N.D. Illinois, E.D.

Nov. 30, 1984.

Malcolm M. Gaynor, Richard M. Bendix, Jr., Schwartz, Cooper, Kolb & Gaynor Chtd., Mark D. Romness, William S. Leavitt, Chicago, Ill., Ronald A. Oster, Joseph O'Malley, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for debtor in possession.

J. William Cuncannan, Sarah M. Stegemoeller, DeFrees & Fiske, Chicago, Ill., for Official Creditors Committee.

Peter C. John, Douglas J. Lipke, Matthew J. Gehringer, Phelan, Pope & John, Ltd., Louis W. Levit, Levit & Mason, Ltd., Chicago, Ill., for Zurich Ins. Co.

Lloyd E. Williams, Anthony P. Katauskas, Jacobs, Williams & Montgomery, Ltd., Chicago, Ill., for Commercial Union Ins. Co.

John G. Jacobs, Robert Plotkin, Jonah Orlofsky, Plotkin & Jacobs, Chicago, Ill., Stuart Parker, Siff & Newman, P.C., New York City, for American Mut. Liability Co.

Daniel J. Pope, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., for American Re-Insurance Co.

Thomas L. Aries, Merrill C. Hoyt, Harvey J. Cohen, Aries, Hoyt & Williams, Stanley B. Block, Donald W. Jenkins, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for Continental Ins. Co. and Underwriters Adjusting Co.

Thomas C. Walker, James E. O'Halloran, Jr., O'Halloran, Lively & Walker, Northbrook, Ill., for Corroon & Black of Illinois, Inc.

Gerald G. Saltarelli, Ronald Butler, James I. Rubin, Ellen M. Babbit, Butler, Rubin, Newcomer, Sattarelli & Boyd, Michael J. Gallagher, Cassiday, Schade &

Gloor, Chicago, Ill., for Bituminous Cas. Corp.

Philip J. McGuire, Michael E. Dowd, Dowd & Dowd, Ltd., Chicago, Ill., for Northbrook Excess and Surplus Ins. Co.

Philip C. Stahl, Donald Vogelsang, Gary M. Elden, Reuben & Proctor, Chicago, Ill., for Nat. Sur. Corp. and Fireman's Fund Ins. Co.

Perry L. Fuller, Robert E. Nord, Fritz K. Huszagh, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for Continental Cas. Ins. Co.

Patrick W. O'Brien, Kenneth J. Jurek, Hope G. Nightingale, Mayer, Brown & Platt, Chicago, Ill., for Ins. Service Office, Inc.

Donald M. Haskell, Michael Sehr, William F. Ryan, Haskell & Perrin, Chicago, Ill., for Home Ins. Co.

Michael J. Dolesh, David M. Spector, Isham, Lincoln & Beale, Chicago, Ill., for Employers Reinsurance Co.

## MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

UNR Industries, Inc. and its affiliates are debtors in Chapter 11 bankruptcy proceedings in this district. As part of those proceedings UNR initiated this adversary action to enforce its rights as an insured under numerous liability insurance policies with the various defendant insurance companies, and for other relief. After the decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), and before the Bankruptcy Amendments of 1984 this court withdrew the reference of the adversary proceeding. Presently before the Court are several motions to dismiss directed against the two federal law counts and some of the state law counts in UNR's first amended complaint.

### I. Count 1

Count 1 alleges that defendant insurance companies Continental, Bituminous, and Zurich (the "primary carriers"), along with Underwriters Adjustment Company, violated Section One of the Sherman Act, 15 U.S.C. § 1, by conspiring to deprive UNR of its right to full indemnification for and defense of asbestos-related claims under policies previously issued by the primary carriers. Specifically, UNR alleges that defendants agreed to a formula capping the liability of each primary carrier for asbestos claims at a stated percentage of UNR's total liability, thereby forcing UNR to pay at least 35% of both the cost of defending asbestos claims and the cost of any judgments. This formula is claimed to be in violation of each defendant's contract of insurance which provides for full indemnification and defense of UNR in asbestos claims. Defendants also allegedly misled UNR as to the availability of full indemnification and defense under its policies. UNR claims defendants forced it to comply with their formula by misleading UNR as to the meaning of their policies, threatening to withdraw all indemnification for and defense of asbestos claims, and threatening to institute litigation concerning UNR's policies. Continental, as the only defendant whose policy was current at the time of the alleged conspiracy, is said to have agreed to enforce the agreement by threatening to cancel its policies midstream, demand higher premiums, and impose a $15,000 deductible for all asbestos claims arising after January 1, 1976.

UNR claims that defendants have made good on the above threats. Defendants have sued UNR concerning the interpretation of UNR'S policies. Continental did in fact impose a $15,000 deductible in early 1976, by 1978 had increased the deductible to $30,000, and subsequently added an asbestos exclusion to its policies. When in 1981 UNR demanded full indemnification for and defense of its asbestos claims Zurich, Bituminous and Continental responded by terminating all payments for indemnification and defense.

The motion to dismiss count 1 has two bases. Defendants first argue the activities alleged do not violate the antitrust laws. Second, they argue that even if they

have violated the antitrust laws their activities are exempt from antitrust scrutiny under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–15.

■ UNR's answer to defendants' motion offers three theories to support its claim that defendants have violated the antitrust laws. The first and most strongly argued theory is that defendants' combined refusal to abide by their contracts of insurance constitutes "retroactive price-fixing." If the price-fixing label is applicable to these facts then the complaint adequately states a claim under the antitrust laws, since price-fixing is a *per se* antitrust violation. *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982).

To bring defendants' actions under the heading of price-fixing, UNR first points out that the price paid and the value received by a consumer are economically equivalent. From that equivalence UNR argues that competitors can price-fix in two different ways. The first and traditional method is for competing sellers to agree on a price (usually higher than that which competitive forces would have set) to be charged in the future. The second method, and the method charged in UNR's complaint, is for sellers to sell at a competitive price but then agree among themselves to deliver less of the product or service than is called for by the sale contract. Put simply, UNR's argument is that charging more than something is worth and delivering less than what was bought both have the same result: the consumer gets back less value than he paid out. Since both methods give the same bad result, argues UNR, both methods deserve the same bad label: price-fixing.

The Seventh Circuit has recently stated that the "mere attachment of a *per se* label by a plaintiff to defendants' conduct does not automatically invoke the *per se* doctrine and eliminate the requirement that the plaintiff allege and prove the anticompetitive effects of defendants' conduct. The defendants' conduct must be analyzed to determine whether it should receive *per*

*se* treatment." *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1284 (7th Cir.1983).

■ Here, such analysis reveals defendants' conduct is not *per se* illegal. The flaw in UNR's argument is that it confuses the conduct the antitrust laws are aimed at with what they try to achieve. The antitrust laws are based on the assumption that consumers are best served by a competitive market and to that extent can be said to promote consumer welfare. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979); *Sutliff, Inc. v. Donovan Companies*, 727 F.2d 648 (7th Cir.1984). But the Sherman Act does not outlaw every action that hurts consumer welfare, it outlaws "[e]very contract, combination ... or conspiracy [ ] in *restraint of trade*." 15 U.S.C. § 1 (emphasis supplied). As the Supreme Court has said, the antitrust laws do "not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Hunt v. Crumboch*, 325 U.S. 821, 826, 65 S.Ct. 1545, 1548, 89 L.Ed. 1954 (1945). *See also Sutliff*, 727 F.2d at 655 ("the Sherman Act did not make ordinary business torts federal torts for which treble damages could be recovered'). Therefore, while every antitrust violation is presumed to harm consumers, not every harm to a consumer is or can be presumed to be an antitrust violation. All UNR's argument shows is that it is a consumer and has been harmed by conspiring sellers, but that allegation is not sufficient to state an antitrust claim.

■ Another way to see the flaw in UNR's argument is to remember that *per se* status (which is what UNR is after) has been conferred on price-fixing not merely because it harms consumers (which it does) but because it harms consumers in a particular way—by (almost always) restraining competition. *Maricopa*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48. The price-fixing label can by analogy attach to conduct more subtle than a simple conspiracy to directly fix prices, *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64

L.Ed.2d 580 (1980) (agreement to stop selling on credit); *In re Wheat Rail Freight Rate Antitrust Litigation*, 579 F.Supp. 517 (N.D.Ill.1984) (agreement on how freight rates would be calculated), but the analogy is successful only if the challenged conduct is, like traditional price-fixing, virtually certain to reduce competition. *Catalano*, 446 U.S. at 649–50, 100 S.Ct. at 1928–29; *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1284 (7th Cir.1983) ("only conduct that is 'manifestly anticompetitive' will be considered a *per se* offense"). UNR's analogy, by contrast, rests on the fact that defendants' conduct is broadly like traditional price-fixing in the sense that it harmed a consumer. What UNR has not shown is that defendants' conduct is like traditional price-fixing in that it "would always or almost always tend to restrict competition and decrease output." *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562–63, 60 L.Ed.2d 1 (1979). Absent such a showing, defendants' conduct cannot be *per se* illegal.

■ Rejecting UNR's *per se* argument does not, of course, end the inquiry. The question remains as to whether any of the facts alleged could constitute an unreasonable restraint of trade under a rule of reason analysis. UNR's second and third theories attempt to show such an unreasonable restraint. Its first argument on this issue is brief but to the point:

A rule of reason analysis of the alleged facts would demonstrate that three competitors and their agent, all of whom should have been servicing UNR at the same time, agreed to eliminate any possibility of competition in the provision of such servicing. They agreed to withhold

benefits; to apply deductibles retroactively to cover a period when no deductibles were included in the policies, and to eliminate coverage entirely when UNR demanded the full coverage to which it was entitled. UNR was required to pay, not only for the original policies, but [for] the very benefits for which it had [already] paid.

(UNR's answer brief at 20.)

■ UNR's third theory, though phrased in terms of boycott and coercion, is based on essentially the same facts as its second theory[1] and therefore the two theories will be analyzed together.

The problem with both these theories is that they fail to show that defendants' conduct had any effect on competition. This is not a situation where defendants were competing to get or even keep UNR's business—they already had UNR's business. Defendants' duties are therefore not derived from the antitrust laws' vision of how competitors should behave; they are derived from the contracts each defendant had with UNR. Of course it is always open to competitors to provide more than their contract requires, and the Supreme Court has apparently recognized that agreements foreclosing that possibility violate the antitrust laws. *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 553, 98 S.Ct. 2923, 2935, 57 L.Ed.2d 932 (1978). However, UNR's complaint and answer make clear that it is not complaining of a lack of competition in extra-contractual service. Its complaint is that defendants have failed to do that which their contracts require. Since defendants' conduct towards UNR is fixed by each defendant's contract, there is no role for competition to

---

1. UNR appears to argue that the boycott it alleges (and perhaps the coercion as well) constitutes a *per se* violation. However, group boycotts are illegal *per se* only if they are used to enforce agreements that are themselves illegal *per se*. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir.1984); *cf. Indiana Federation of Dentists v. FTC*, 745 F.2d 1124 at 1131 n. 8 (7th Cir.1984) (questioning the *Car Carriers* rule). Since no price-fixing or other *per se* violation has been shown, that would appear to dispose of UNR's *per se* claim. In any event, UNR's boycott claim, like its price-fixing claim is not of the traditional type and therefore must be scrutinized for anticompetitive effect. *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1284 (7th Cir.1983). Since as discussed below UNR's boycott and coercion claims have nothing to do with the competition the antitrust laws are meant to protect, they perforce do not state a *per se* claim.

play. If one of these defendants decided to defend and indemnify UNR against a particular asbestos claim, that decision would not be made because free market forces compelled it; it would be made because that defendant's contract required it. Similarly, if one of these defendants wrongfully refused to defend and indemnify UNR, that refusal is not wrongful because it represents a lessening of competition but rather because it represents a breach of contract.

UNR also asserts that while each of these defendants could have breached their contracts individually without violating the antitrust laws, a *conspiracy* to breach is a violation. However, that assertion misapprehends the reason why conspiracies and simultaneous individual acts are treated differently under the Sherman Act. As already noted, the antitrust laws are designed to protect competition. If competitors simultaneously but independently raised their prices, the antitrust laws assume that since there was no conspiracy the price increase must have been caused by market forces and is therefore unobjectionable. That is, a conspiracy is a necessary condition for a violation of Section One of the Sherman Act. *Monsanto Co. v. Spray-Rite Service Corp.*, —— U.S. ——, 104 S.Ct. 1464, 1469–71, 79 L.Ed.2d 775 (1984). However, a conspiracy is not a *sufficient* condition as UNR seems to assume. Accepting that further assumption would mean that every conspiracy to commit some kind of wrong in the course of business would ipso facto constitute a restraint of trade in violation of the Sherman Act. That result was certainly not intended by the Sherman Act's framers, *Sutliff, Inc. v. Donovan Companies*, 727 F.2d 648, 655 (7th Cir.1984). Moreover, it is simply not true that every such conspiracy has the effect of restraining trade, and this case is a good example. UNR does not allege that defendants' conspiracy affected the market for insurance policies or any other market. The only effect alleged, ignoring UNR's

conclusory allegations, is a simple breach of contract and the concomitant harm to UNR. Even assuming that defendants would have been unable to successfully breach their contracts unless they acted in concert, that fact does not transform a breach of contract into a restraint of trade.

The essential difference between an agreement not to compete and an agreement not to honor contracts makes the cases principally relied on by UNR inapposite. In *Radiant Burners v. Peoples Gas Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961), the Court held that a conspiracy to make the sale of plaintiff's gas burner impossible by refusing to provide gas to plaintiff's purchasers stated a claim under the Sherman Act. In *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978), the claim was that defendants conspired to prevent St. Paul's policy holders from getting medical malpractice insurance from any other insurance company. The conduct involved in these cases was a potential violation of the Sherman Act not simply because a conspiracy was involved and a competitor or consumer was injured as a result. Those cases involved an attempt to prevent one or more competitors from making contracts in the future; that is, from engaging in trade. Since UNR makes no allegation that anyone was restrained from engaging in trade (as opposed to abiding by a contract), those cases do not support UNR's position.

Put simply, UNR's argument is an attempt to avoid the requirement that anticompetitive effect be pleaded and adequately supported by factual allegations. *See Bunker Ramo*, 713 F.2d at 1284; *Havoco of America v. Shell Oil Co.*, 626 F.2d 549, 555 (7th Cir.1980). UNR's view is that every conspiracy that harms a consumer violates the Sherman Act. For the reasons stated above, that theory is simply untenable. Without adequate allegations of anticompetitive effect count 1 is fatally defective and must be dismissed.[2]

2. UNR's answer brief states that defendants refused to issue policies to UNR. *Id.* at 8. How-

ever, no such allegation is made in the amended

## II. Count 2

The second count alleges that defendant insurance companies American Mutual, Fireman's Fund, National Surety, Commercial Union, Falcon, and defendant Insurance Services Office conspired together with other members of the insurance industry to deprive UNR and other asbestos manufacturers of the full defense of asbestos claims to which UNR and the others were entitled under their policies, to impose fraudulent policy interpretations on their insureds so as to avoid their obligations under those policies, and to disrupt and eliminate the market for occurrence liability policies so that they could market a claims-made policy which provides less coverage at higher premiums. UNR also alleges that these objectives were promoted by withdrawing coverage from insureds, by "boycott," and by "instituting litigation." First amended complaint at par. 39(e).

 Count 2 charges, with one exception, the same type of conduct charged in count 1. Not surprisingly, UNR's answer to the motion to dismiss count 2 is in great measure identical to its answer to the motion to dismiss count 1, though the main emphasis is placed on the boycott theory rather than the price-fixing theory. No reason is given for finding an antitrust violation that was not rejected above, and therefore the similar charges in count 2 fail for the same reason: insufficient allegation of anticompetitive effect.

The one new charge made in count 2 is that the count 2 defendants conspired to refuse to issue occurrence policies. UNR's answer brief makes no mention of that charge, apparently because UNR concedes that a joint decision by insurers to offer one type of policy rather than another is the type of decision that is protected by the McCarran-Ferguson Act.

 The McCarran-Ferguson Act exempts from the antitrust laws conduct which is the business of insurance, is regulated by state law, and does not amount to boycott, coercion or intimidation. 15 U.S.C.

§§ 1012–1013. *Union Labor Life Insurance Co. v. Pireno*, 458 U.S. 119, 129, 102 S.Ct. 3002, 3008, 73 L.Ed.2d 647 (1982), sets forth the three criteria for determining whether a particular practice constitutes the business of insurance within the McCarran-Ferguson Act:

*first,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry.

 It is obvious that an agreement to change the type of policy offered is the business of insurance. The type of coverage offered directly affects the spreading of risk, is at the very heart of the policy relationship, and the agreement is limited to insurance companies.

 Turning to the second requirement, there is little question that this conduct is regulated by state law. Illinois has a comprehensive insurance code, Ill.Rev. Stat. ch. 73, § 1 *et seq.* (1981), which is sufficient to satisfy this requirement. *Klamath-Lake Pharmaceutical Ass'n v. Klamath Medical Service Bureau,* 701 F.2d 1276, 1287 (9th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983).

 Finally, an agreement to change to a new type of policy is not a boycott and does not constitute coercion or intimidation. In *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978) the Court held that refusing to offer any coverage at all would be a boycott and hence not exempt under the McCarran-Ferguson Act. However, the Court explicitly recognized that fixing "rates or terms of coverage" would not constitute a boycott. *Id.* at 544, 98 S.Ct. 2923, 57 L.Ed.2d 932. *See also Grant v. Erie Ins. Exchange,* 542 F.Supp. 457 (M.D.Pa.1982), *aff'd,* 716 F.2d 890 (3d Cir. 1983). Therefore, the conspiracy to refuse to issue occurrence policies, while it might violate the antitrust laws as a concerted

complaint and therefore it has not been con- sidered.

refusal to deal, is exempt from antitrust scrutiny under the McCarran-Ferguson Act. Since no antitrust allegations remain in count 2, it is dismissed.[3]

### III. Count 4

Count 4 charges a breach of an "implied covenant of good faith and fair dealing" against defendant insurance companies Continental, Bituminous, Zurich, Home, Commercial Union, Falcon, Continental Casualty Company, National Surety, Fireman's Fund and American Mutual. Count 4 requests compensatory and punitive damages from each of the above-named defendants.

Count 4 is based on the same facts alleged in count 1 plus the charges of breach of insurance contract made in count 3. Detailed review of the facts is unnecessary since the motion to dismiss is aimed at count 4's legal, not factual, basis. The five moving defendants claim that any recovery under this theory is preempted by § 155 of Illinois Insurance Code of 1935 (Ill.Rev. Stat. ch. 73, § 767 (1981)), which authorizes a court to award attorneys' fees plus a statutorily defined amount (in no event to exceed $5,000) when the court finds that the insurance company's action in refusing to recognize its liability under its insured's policy was "vexatious and unreasonable."

This Court has previously held that § 155 preempts any common-law tort recovery against an insurer. *Gibe v. General American Life Ins. Co.*, 84 C 1280 (N.D.Ill. May 24, 1984). An earlier case by this court dismissing a tort claim for compensatory and punitive damages against an insurer is presently on appeal. *United of America Bank v. Aetna Casualty and Surety Co.*, 83 C 8154 (N.D.Ill. April 3, 1984), *certified for appeal* in order dated April 26, 1984, *appeal accepted,* Misc. 84-8022 (7th Cir. June 12, 1984). It therefore appears that a definitive ruling will soon settle the issues raised by the motion to

dismiss count 4. To avoid delay in this case, however, the present motion will be decided now. Furthermore, the continuing judicial debate on these issues [4] has convinced this court to reexamine its position.

Since the Illinois Supreme Court has not decided this issue, this court must predict what rule that Court would adopt if faced with the issue. *Harris v. Karri-On Campers, Inc.*, 640 F.2d 65, 68 (7th Cir. 1981); *Barr Co. v. Safeco Ins. Co. of America*, 583 F.Supp. 248, 252–54 (N.D.Ill. 1984). In making that decision, this court must consider all the data which the Illinois Supreme Court would consider and follow the approach that Illinois courts take toward the problem. *Harris*, 640 F.2d at 68.

Although the Illinois Supreme Court has not passed on preemption as it relates to this particular statute, it has addressed the issue of statutory preemption before. In *Hall v. Gillins*, 13 Ill.2d 26, 147 N.E.2d 352 (1958), the Court held that no new common-law right of action for a wrongful death would be recognized where the legislature had created a wrongful death remedy by statute. Though the statutory remedy differed substantively from the proposed common-law action in that it limited the kinds of damages that could be recovered to pecuniary injury and limited the amount of damages that could be recovered to $20,000, the Court was persuaded those differences were "not sufficiently significant" to justify creating a new remedy. 147 N.E.2d at 355.

A few years later the Court held that the Dram Shop Act of 1872 (now in Ill.Rev. Stat. ch. 43, § 135) preempted any common-law recovery for damages caused by the negligent sale of liquor. *Cunningham v. Brown*, 22 Ill.2d 23, 174 N.E.2d 153 (1961). In *Cunningham*, the Court reviewed the history leading up to the 1872 Act and found that the Act was passed because (1) no common-law action against tavern oper-

---

**3.** Since count 2 is dismissed for failure to state a claim, the separate motion of Insurance Services Office need not be addressed.

**4.** The Illinois cases are discussed below. For a summary of the varying decisions within this district, *see Barr Co. v. Safeco Ins. Co. of America,* 583 F.Supp. 248, 251 (N.D.1984).

ators for the sale of liquor existed, and (2) the "temperance forces were demanding that the cost of the intoxicating liquor should bear the damages it caused." 174 N.E.2d at 156. Since the statutory remedy and the proposed common-law remedy both had the same basic purpose—to make the tavern operator liable for damages caused by his sale of liquor—the Court concluded that the two remedies were "almost coincidental" except for the amount of damages recoverable. The Court then cited *Hall* for the proposition that the statutory limit of $15,000 on the amount that could be recovered was not reason enough to create a common-law action.

■■■ These two cases illustrate two principles relevant to the question in this case. First, when the legislature has provided a remedy for a heretofore unremedied evil, the courts should not allow an end-run around the limits imposed by that statute by creating a common-law action that remedies the same basic evil. Second, the statutory and common-law actions need not be identical for preemption to occur. In *Hall*, for example, the legislature's allowing recovery only for pecuniary injury did not justify creating a new tort that would allow recovery for the "destruction of the family unit" as plaintiffs in that case claimed. 147 N.E.2d at 355. Similarly, in *Cunningham* the fact that the statute imposed liability without fault did not convince the Court to create a parallel but fault-based common-law action. 174 N.E.2d at 155. Finally, both cases held that statutory limits on the amount recoverable were not reason enough to create a common-law remedy.

Of course, not just any overlap between the statute and the common-law remedy will do. Whether the legislature intended to remedy the same basic evil as the common-law remedy is aimed at "must be ascertained through examination of the practical considerations to which the legislature directed itself when enacting ... the ... statute." 174 N.E.2d at 156. Since the statute here in question does not explicitly reveal the evil the legislature was con-

cerned with, an examination of legislative history is necessary.

Section 155 of the Illinois Insurance Code was first enacted in 1937 as part of a comprehensive revision of the insurance laws. That first version of § 155 allowed reasonable attorneys' fees if the insurance company was found to have behaved vexatiously and without reasonable cause. The fee award could not exceed the lesser of 25% of the amount the court or jury awarded the insured (presumably on his contract claim), $500, or the difference between the amount awarded the insured and the amount the insurance company had offered in settlement before the lawsuit.

The only indication of the legislature's intent this court has found appears in an article explaining the New Code generally. *Havinghurst, Some Aspects of the Illinois Insurance Code*, 32 Ill.L.Rev. 391 (1937). Written by the chairman of the committee of the Illinois State Bar Association Insurance Law Section which drafted the basic version of the 1937 revision, the article describes § 155 as "objectionable to [insurance] companies" because "courts are apt to allow exorbitant amounts" for attorneys' fees thus driving up premium rates. To rebut that objection the author points out that (1) the court, not the jury, makes the fee award, (2) "[n]o stated penalty is provided for," and (3) the limits ($500 maximum at that time) on the amount that could be awarded make the attorneys' fees provision "the most moderate of any of the statutes." *Id.* at 404. The author then states:

> In the absence of any allowance of attorneys' fees, the holder of a small policy may see practically his whole claim wiped out by expenses if the company compels him to resort to court action, although the refusal to pay the claim is based upon the flimsiest sort of a pretext. The strict limit on the amount allowable makes the section significant only for small claims. It should prove wholesome in its effect upon companies unreasonably withholding payment of such claims. It is doubtful if there are

many judges who would allow such fees when the defense was bona fide although deemed inadequate.

One commentator has concluded from the above article that the sole purpose of § 155 was to make possible suits by holders of small policies by awarding the attorneys' fees that otherwise would consume the holder's recovery on the policy. *Durham, Section 767 of the Illinois Insurance Code: Does It Pre-Empt Tort Liability?*, 16 John Marshall L.Rev. 471, 492–93. However, the language of the statute as well as the above quotations from Havinghurst's article contradict that conclusion. If the legislature's sole purpose was to make suits by holders of small policies economically worthwhile, then the statute would have conditioned the fee award on the *insured's* conduct by looking to whether the insured had prevailed and was not otherwise undeserving. *See Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 416–17, 98 S.Ct. 694, 697–98, 54 L.Ed.2d 648 (1978) (interpreting section 2000e–5(k) of Title VII). Limiting attorneys' fee awards to cases where the *insurer's* conduct was vexatious or unreasonable suggests that a second purpose—punishing misbehaving insurance companies—was at work. As Mr. Havinghurst wrote, § 155 "should prove wholesome in its effect upon companies unreasonably withholding payment of [small] claims." Although it could be argued that the punitive remedy is insufficient where the policy amount is large, *Cunningham* and *Hall* show that a court must not second-guess the legislature's decision concerning the amount necessary to fulfill the statute's purpose. That is especially so when the constitutional provision which was invoked to support the inadequate-remedy argument in those two cases (that "Every person ought to find a certain remedy in the laws for all injuries and wrongs which he may receive;" Ill. Const. Art. II) has no application to the availability of punitive damages.

One appellate court has decided that the original § 155 does not preempt punitive damages. In *Lynch v. Mid-America Fire & Marine*, 94 Ill.App.3d 21, 418 N.E.2d 421, 49 Ill.Dec. 567 (4th Dist.1981), the court viewed § 155 as simply reversing the normal rule against allowing attorneys' fees and stated "[t]he tenor of the section gives no indication that it was intended to cover the field of awarding compensation for bad faith or vexatious dealing by insurers." 418 N.E.2d at 426, 49 Ill.Dec. at 571. By lumping punitive and compensatory damages together, however, that court did not follow the approach laid down in *Hall* and *Cunningham*. While it may be true that § 155 was not intended to "cover the field of awarding compensation," the above discussion shows the 1937 legislature did intend § 155 to fulfill the role of *punitive* damages. Whether § 155 preempts compensatory damages is, of course, another matter.[5]

The 1977 amendments to § 155 increased the punitive effect of the award by removing the cap on attorneys' fees and providing for the award of a separate sum not to exceed $5,000. Not surprisingly, every Illinois appellate court that has considered the the issue agrees that the present version of § 155 preempts punitive damages. *Kinney v. St. Paul Mercury Ins. Co.*, 120 Ill.App.3d 294, 458 N.E.2d 79, 75 Ill.Dec. 911 (1st Dist.1983); *Hoffman v. Allstate Ins. Co.*, 85 Ill.App.3d 631, 407 N.E.2d 156, 40 Ill.Dec. 925 (2d Dist.1980); *Debolt v. Mutual of Omaha*, 56 Ill.App.3d 111, 371 N.E.2d 373, 13 Ill.Dec. 656 (3d Dist.1978); *Fisher v. Fidelity & Deposit Co. of Maryland*, 125 Ill.App.3d 632, 466 N.E.2d 332, 80 Ill.Dec. 880 (5th Dist.1984). Even were this court not otherwise persuaded that punitives are preempted, the uniform rule adopted by these decisions "is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide

---

**5.** *Roberts v. Western-Southern Life Ins. Co.,* 568 F.Supp. 536 (N.D.Ill.1983) agreed with *Lynch* that the original version of § 155 did not preempt punitive damages. Like *Lynch, Roberts*

relied on the difference between the remedy in § 155 and the remedy of compensatory damages to conclude that punitive damages are not preempted.

otherwise." *West v. AT & T,* 311 U.S. 223, 237, (1940); *see also White v. United States,* 680 F.2d 1156, 1161 (7th Cir.1982). No such persuasive data exists.[6] Therefore, this court concludes that § 155 preempts any award of punitive damages based on a common-law theory at all times relevant to this case.

■ Count 4 also claims compensatory damages. As the labels suggest, compensatory and punitive damages serve different purposes: the former compensates the plaintiff while the latter punishes the defendant. Although both kinds of damages can be recovered by one plaintiff for one wrong, they should, strictly speaking, be considered the fruits of separate action. Compensatory damages are recovered by a plaintiff acting solely for himself to remedy his own wrong. Punitive damages, by contrast, are recovered by an "attorney general" (whether private or public) acting to punish and deter behavior that has been deemed harmful to the public at large. Therefore, in accord with the approach illustrated by *Hall* and *Cunningham,* the legislative history must be reviewed again to see whether § 155 was also intended to compensate insureds who had suffered loss as a result of vexatious and unreasonable behavior by their insurance company.

As already discussed, the Havinghurst article suggests the original § 155 had two purposes: to make suits by holders of small policies economically feasible, and to punish misbehaving insurance companies. The article makes no mention of an intent to compensate plaintiffs for actual losses. Moreover, the wording of the statute itself contradicts such an intent. Section 155

does not provide for an award in the general sense; it provides for attorneys' fees. As the statute itself states, attorneys' fees are considered "part of the taxable costs in the action" rather than part of the damages sustained. Therefore the language the legislature expressed itself in belies any intent to address the problem of compensating the plaintiff for damages sustained.

The substance of the statute also belies any intent to preempt compensatory damages, since the provisions of § 155 are fully explainable in terms of a punitive purpose, and some of its provisions are *only* explainable in terms of that purpose. As already noted, § 155 applies only when the insurer's conduct was vexatious and unreasonable. That limitation makes perfect sense if the award is intended to punish the defendant, but little sense if the award is intended to compensate the plaintiff since the need for compensation is wholly independent of the vexatiousness of the insurer's conduct. Similarly, the computation of the statutory award is consistent with a punitive but not a compensatory purpose. The award is not figured by looking to the losses sustained, but rather by looking to the amount of reasonable attorneys' fees incurred. While that method of computation is consistent with a punitive purpose, *see* the Havinghurst article *supra* and *Barr v. Safeco Ins. Co. of America,* 583 F.Supp. 248, 255 (N.D.Ill.1984), the amount of attorneys' fees bears no necessary relation to the amount of loss.

The 1977 amendments to § 155 likewise do not evidence an intent to address the issue of compensation. As with the origi-

---

**6.** *Roberts v. Western Southern Life Ins. Co.,* 568 F.Supp. 536 (N.D.Ill.1983), found such persuasive data in a report by the state commission which drafted the 1977 amendments. The report stated that the commission "thought that the insurance industry might have taken the opportunity to establish statutory limits on the amount of punitive damages. This was not done." *Id.* at 549. Since it contradicts the intent of the 1937 legislature and the intent most naturally inferred from the 1977 amendments, that statement can only be persuasive if the statutory action and the common-law action are

significantly different. *Roberts* argues they are significantly different because the statute looks to objective qualities of the insurer's conduct ("vexatious and unreasonable action") and so sets a lower standard than the common law, which looks to the subjective intent of the insurer ("bad faith" and "malicious"). Even if realistic, however, that difference is exactly analogous to the difference between absolute and fault-based liability which *Cunningham* found insufficient to justify the creation of a common-law remedy. 174 N.E. at 155.

nal version, the legislative history contains no suggestion of such intent. Nor do the amendments themselves show such an intent. The amendment removing the limit on the amount of attorneys' fees recoverable may make more suits against insurers economically feasible but does nothing to compensate the plaintiff for the damages giving rise to the suit. Similarly, the award of a sum not to exceed $5,000, being governed by the same standards as the attorneys' fees award of the original section, is no more related to compensation than the original statute was. The only intent this court can discern from the amendments is an intent to increase the effectiveness of the statute in achieving the two purposes identified in Mr. Havinghurst's article by separating the attorneys' fees award from the punitive damages award and allowing a court to impose both. As with the original statute, the purposes of providing attorneys' fees and punishing errant insurers fully explains the provisions of the present statute.

Since every provision of the present and original § 155 is fully explained by and furthers the purposes of making suits economically feasible and punishing errant insurers, there is nothing left over to serve the purpose of compensating plaintiffs. To hold that the original § 155 or the obviously punitive cash award of the current statute also preempts compensatory damages would require the unusual assumption that one award can serve both purposes. As already discussed, neither the legislative history nor the statute itself suggests that the legislature acted on that assumption. Indeed, the very notion of punitive damages is inconsistent with the idea of one award for both purposes since requiring a defendant to compensate his victim is normally considered restitution, not punishment.[7] Therefore, this court concludes that the analysis mandated by *Hall* and

*Cunningham* shows that § 155 was not intended to and does not preempt recovery of compensatory damages on a tort theory.

The two Illinois appellate courts that have considered the issue of compensatory damages are split. The first district has consistently held that § 155 preempts all tort actions based on an insurer's bad faith conduct and has therefore upheld dismissals of compensatory damage claims based on such an action. *Trautman v. Knights of Columbus,* 121 Ill.App.3d 911, 460 N.E.2d 350, 77 Ill.Dec. 294 (1984); *Kinney v. St. Paul Mercury Ins. Co.,* 120 Ill. App.3d 294, 458 N.E.2d 79, 75 Ill.Dec. 911 (1983); *Tobolt v. Allstate Ins. Co.,* 75 Ill. App.3d 57, 393 N.E.2d 1171, 30 Ill.Dec. 824 (1979). The first district opinions, however, do not recognize that compensatory damages have a function wholly different from punitive damages, and do not examine the statute and its history to see if it was intended to serve the compensatory function. The analysis in these opinions is essentially the converse of *Lynch:* they lump punitive and compensatory damages together and then conclude that since the legislature intended to preempt the former it also preempted the latter. *See, e.g., Tobolt,* 393 N.E.2d 1179–80, 30 Ill.Dec. at 832–33, which quotes extensively from *Debolt v. Mutual of Omaha,* 56 Ill.App.3d 111, 371 N.E.2d 373, 13 Ill.Dec. 656 (4th Dist.1978), *leave to appeal denied,* 71 Ill.2d 602, an opinion which dealt solely with the question of punitive damages.

The second district has held that while § 155 preempts punitive damages, it "does not preempt a plaintiff's right to claim compensatory damages for a breach of good faith and fair dealing." *Hoffman v. Allstate Ins. Co.,* 85 Ill.App.3d 631, 407 N.E.2d 156, 40 Ill.Dec. 925, 928 (1980). Based on the above examination of § 155 and its history, this court concludes that *Hoffman* correctly applied the principles

---

7. *Knierim v. Izzo,* 22 Ill.2d 73, 174 N.E.2d 157 (1961), which held that "compensatory damages [can] be sufficiently punitive," does not detract from the foregoing analysis. In that case no limit was placed on the amount of compensatory damages, so it was reasonable to assume that

the same amount would properly punish the wrongdoer. The statute involved here, however, places strict limits on the amount that can be awarded. It would be unreasonable to assume that same amount could "sufficiently" compensate the plaintiff.

laid down by *Hall* and *Cunningham* and predicts that the Illinois Supreme Court would agree with *Hoffman* rather than the first district's position. Therefore, the motion to dismiss count 4 is denied but the request for punitive damages is stricken.

## IV. Count 7

Count 7 alleges that defendants Continental, Zurich, Bituminous, Underwriter's Adjusting Company, Home, Continental Casualty Company, Commercial Union, Falcon, American Mutual, National Surety and Fireman's Fund are liable for compensatory damages and attorneys' fees under the Illinois Unfair Claims Practices Act, Ill.Rev.Stat. ch. 73, § 766.6 (1981). However, the Illinois appellate courts agree that § 766.7 provides no private right of action but simply defines those practices for which the Illinois Director of Insurance may issue a cease and desist order under § 766.8. *Hamilton v. Safeway Ins. Co.*, 104 Ill.App.3d 353, 432 N.E.2d 996, 60 Ill. Dec. 97 (1st Dist.1982); *Hoffman v. Allstate Ins. Co.*, 85 Ill.App.3d 631, 407 N.E.2d 156, 40 Ill.Dec. 925 (2d Dist.1980); *Tobolt v. Allstate Ins. Co.*, 75 Ill.App.3d 57, 393 N.E.2d 1171, 30 Ill.Dec. 824 (1st Dist. 1979). UNR relies on *Scroggins v. Allstate Ins. Co.*, 74 Ill.App.3d 1027, 393 N.E.2d 718, 30 Ill.Dec. 682 (1st Dist.1979), but that court's statement that § 766.6 was "enacted for the benefit of the insured ... as well as to provide an administrative enforcement mechanism for the benefit of the public at large" is, besides being dicta, not sufficient to sustain an implied private right of action. Illinois courts imply such an action only where it is both consistent with and *necessary* to achieve the aims of the statute. *Sawyer Realty Group, Inc. v. Jarvis Corp.*, 89 Ill.2d 379, 386, 432 N.E.2d 849, 852, 59 Ill.Dec. 905, 908 (1982). Since the statute allows the Director of Insurance to issue cease and desist orders to any insurer that commits an act proscribed by § 766.6, an implied private right of action is simply not necessary. *Abbott Laboratories v. Granite State Ins. Co.*, 573 F.Supp. 193, 196 (N.D.Ill.1983).

In its brief UNR alternatively asks permission to amend count 4 to base its right to sue on § 155 of the Insurance Code, Ill.Rev.Stat. ch. 73, § 767 (1981). Defendants' reply brief raises no objection to this amendment and this court sees none. Therefore, count 7 is dismissed and UNR is given until December 10, 1984 to file an amended count 7.

## V. Counts 12, 13 and 14

Counts 12, 13 and 14 name UNR's former insurance broker, Corroon & Black of Illinois, Inc. ("defendant"), as the sole defendant and allege professional negligence, breach of fiduciary duty, implied indemnity, and breach of implied and oral contracts. Defendant has moved to dismiss (under Fed.R.Civ.P. 12(b)(6) and 16) and in the alternative for a more definite statement (under Fed.R.Civ. 12(e)) as to all three counts. While the allegations in these counts are broadly phrased, they are not "so vague that [the defendant] cannot reasonably be required to frame a responsive pleading." *McDougall v. Donovan*, 552 F.Supp. 1206, 1208 (N.D.Ill.1982). The details defendant seeks can be gained through discovery. *Wishnick v. One Stop Food & Liquor Store*, 60 F.R.D. 496, 498 (N.D.Ill.1973). Defendant's motion is therefore denied.

## VI. Remaining Counts

The counts which have not been dismissed are all based on state law. If this were an ordinary case the dismissal of the federal claims would, since no diversity is alleged, also require dismissal of the state law claims. *By-Prod Corp. v. Armen-Berry Co.*, 668 F.2d 956, 962 (7th Cir.1982). However, this is not an ordinary case since it originated in the bankruptcy court. The parties are therefore directed to file briefs limited to the question of the proper forum for the remaining claims, keeping in mind the relevant provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984, 98 Stat. 333. Since the choice of forum is normally a plaintiff's, UNR shall file the opening brief by December 17, 1984. Defendants shall file their answer

by December 31 and UNR's reply is due January 7, 1985. No duplication of argument will be permitted and briefs exceeding 15 pages will not be accepted.

IT IS THEREFORE ORDERED that:

(1) Counts 1 and 2 are dismissed.

(2) The request for punitive damages in count 4 is stricken.

(3) Count 7 is dismissed. UNR is given until December 10, 1984, to file an amended count 7.

(4) Defendants are ordered to answer all remaining unanswered counts by December 17, 1984.

(5) UNR's opening brief on the proper forum issue is due December 17, 1984. Defendants' answer brief is due December 31, and UNR's reply brief is due January 7, 1985.

(6) This case is set for a status hearing on January 8, 1985 at 2:00 p.m.